```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/19/11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DEREK BOULWARE,

               Petitioner,

-v.-

DAWSON BROWN,

               Respondent.
------------------------------------------------------------X

10 Civ. 9173 (DAB) (JLC)

REPORT AND
RECOMMENDATION

(Non-ECF Case)

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Deborah A. Batts, United States District Judge:**

Pro se petitioner Derek Boulware ("Boulware") seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction on sufficiency of the evidence grounds and the length of his sentence. After a jury trial in New York Supreme Court, New York County, Boulware was convicted of two counts of robbery in the first degree. He was subsequently sentenced on July 2, 2008 to two consecutive prison terms of eight years, to be followed by five years of post-release supervision. Boulware is currently incarcerated at Upstate Correctional Facility in Malone, New York. For the reasons set forth below, I recommend that the Petition be DENIED.

## I. BACKGROUND

### A. Trial Testimony

At trial, the Government's case was based largely on the testimony of two men whom Boulware allegedly robbed in separate incidents one day apart. The sufficiency of the evidence claim in Boulware's Petition stems from the difference between his own testimony and that of both of the alleged robbery victims, James Kinder ("Kinder") and Christopher Kienel ("Kienel").

1

USDC SDNY
DATE SCANNED 7/19/11

Below, the Government's case is recounted from the testimony of Kinder and Kienel, while Boulware's defense is taken from his own testimony.

### 1. The Government's Case – Kinder's Testimony

At the time of the incident in question, Kinder lived in Harlem near 149th Street and Amsterdam Avenue. (Trial Transcript ("Tr. Trans.") 20:21-21:2). On August 28, 2007, at approximately 3:30 p.m., Kinder went to a local Chinese restaurant to get lunch. (Tr. Trans. 21:14-19). While Kinder was waiting for his order, Boulware approached Kinder and asked him where he was from. (Tr. Trans. 21:20-25). Kinder responded that he was from Illinois, and then picked up his order and began to walk out of the restaurant. (Tr. Trans. 21:25-22:5).

As Kinder left the restaurant, Boulware told defendant to "wait up" and that he "wanted to talk to [him]." (Tr. Trans. 22:22-23). Boulware then asked Kinder if he "[knew] about the Bloods and the Crypts [sic]." (Tr. Trans. 22:23-24). Kinder responded that he did. (Tr. Trans. 22:24-25). Boulware then told Kinder that a man inside the Chinese restaurant "was going to fuck [Kinder] up" and that Boulware had "just saved [Kinder's] ass." (Tr. Trans 22:25-23:1). Boulware further represented to Kinder that he was a Blood, and pointed to two men standing behind him on the sidewalk, stating that they "are with me." (Tr. Trans. 23:2-5).

Kinder thanked Boulware and began to walk away, but Boulware grabbed his shoulder and said, "[W]ait up I don't think you understand. I just saved your ass, you owe me." (Tr. Trans. 23:19-24). Kinder responded, "I didn't know I owed you thank you but I'm going to walk away." (Tr. Trans. 23:24-25). Kinder began walking away, but Boulware grabbed him again and said, "[N]o, you owe me; my boys are going to get pissed if you don't give me some money." (Tr. Trans. 23:25-24:2). Kinder apologized, but maintained that he would not give Boulware any money. (Tr. Trans. 24:2-3). Boulware told Kinder that "[his] boys are going to

2

fuck [Kinder] up" and that if Kinder would "just give [Boulware] some money everything will be okay." (Tr. Trans. 24:3-5).

Once again, Kinder began walking away, but Boulware caught up with him and grabbed him at the street corner, and stated, "I want you to understand, I'm hardcore, I'm fucking hardcore." (Tr. Trans. 24:5-7). At that point, Boulware lifted his shirt and exposed a number of scars that he had on his lower back. (Tr. Trans. 24:8-13). After putting his shirt back down, Boulware again stated that he was "hardcore" and told Kinder to give him money. (Tr. Trans. 24:13-15). Kinder again refused, and Boulware said, "I need to buy a bag of weed for my friends so you need to buy a bag of weed or else they're going to fuck you up." (Tr. Trans. 24:14-18).

After again refusing to give Boulware money, Kinder walked with Boulware to another part of the sidewalk in a continued attempt to talk his way out of giving Boulware any money. (Tr. Trans. 24:20-24). Kinder told Boulware that he didn't know the price of a bag of weed, and Boulware responded that the price was twenty dollars. (Tr. Trans. 24:25-25:2). Kinder said he did not have twenty dollars, and Boulware then indicated that ten dollars would be sufficient. (Tr. Trans. 25:2-6). Even then, Kinder refused to give Boulware any money. (Tr. Trans. 25:6-7).

Boulware then became angry and "got into [Kinder's] face." (Tr. Trans. 25:8-9). Boulware pulled back the baggy shirt he was wearing, patted his right side, where there appeared to be a bulge underneath his shirt. (Tr. Trans. 25:9-10-11, 15-16). Boulware further stated, "Now listen here . . . see this, this is for protection. I don't want to have to use this against you." (Tr. Trans. 25:9-13). Although Kinder believed the bulge to be a weapon, he never actually saw a gun. (Tr. Trans. 25:18-21, 32:11-24). At that point, Kinder took out his wallet and gave

3

Boulware ten dollars. (Tr. Trans. 25:23-24). Boulware thanked Kinder and told him "[N]ow if anybody in this neighborhood tries to fuck with you, just tell them that you know me . . . nobody will fuck with you because me and my boys will take care of them." (Tr. Trans. 25:25-26:3). Later that day, Kinder called the police to report the incident. (Tr. Trans. 27:14-16).

The following day, an officer from the 30th Detective Squad called Kinder to inform him that they had apprehended someone and wanted Kinder to come to their office. (Tr. Trans. 27:20-23). Once there, Kinder was asked to examine a lineup of five people, from which Kinder identified Boulware as the man who had robbed him. (Tr. Trans. 27:25-28:14). Prior to August 28, 2007, Kinder had never seen or spoken to Boulware. (Tr. Trans. 28:15-19).

### 2. The Government's Case – Kienel's Testimony

At the time of the incident, Kienel was a 24 year old student at Rutgers University living in Harlem near the intersection of 149th Street and Broadway. (Tr. Trans. 40:22-23, 41:10-20, 42:13-18). On August 29, 2007, at approximately 12:30 p.m. or 1:00 p.m., Boulware stopped Kienel on 148th Street. (Tr. Trans. 43:13-15). Boulware told Kienel that Kienel was wearing Crip colors and that Boulware was himself a Blood. (Tr. Trans. 43:22-44:1). Boulware indicated that Kienel's blue jeans were Crip colors, and told him that "if [Kienel] gave him money or [bought] him and his friends some weed he would let [Kienel] go through safely." (Tr. Trans. 45:1-3). Kienel checked his wallet and told Boulware that he didn't have any money, even though he did, in fact, have money in his wallet. (Tr. Trans. 45:6-12). When Kienel showed Boulware his wallet, Boulware grabbed one end of it, but Kienel was able to pull the wallet back. (Tr. Trans. 45:13-20). Boulware then drew his fist back as if he were going to hit Kienel, but did not. (Tr. Trans. 45:21-23).

4

Boulware then lifted up his shirt and displayed in his right pocket what Kienel believed to be the end of a black gun. (Tr. Trans. 45:25, 46:2-3, 46:7-47:23). Simultaneously, Boulware asked Kienel, "How much is your life worth to you?" (Tr. Trans. 46:6). Kienel responded that he valued his life "a lot," at which point Boulware signaled to his "friend" across the street to come to them. (Tr. Trans. 47:24-48:3-6). Boulware indicated that the friend was to stand by them to "make sure that nothing happens." (Tr. Trans. 48:5-19).

Boulware, who was acting "erratically," then walked Kienel to the nearest deli that had an ATM, with the friend following ten feet behind them. (Tr. Trans. 48:20-49:25). Once inside the deli, Kienel attempted to withdraw money from the ATM, but his card was not working. (Tr. Trans. 50:1-5). Kienel looked at the employee working behind the register, but did not say anything because Boulware was in the store, as well. (Tr. Trans. 50:17-51:11). The three of them walked to another deli that had an ATM, but that ATM was out of order. (Tr. Trans. 51:19-52:10). They walked to a third place that had an ATM, but once again Kienel's card did not work. (Tr. Trans. 52:19-53:2).

By this point, Boulware was frustrated. (Tr. Trans. 53:5-15). The three of them then proceeded to a nearby "chicken store" that had an ATM. (Tr. Trans. 54:3-7). Once again, the card did not work, and Kienel offered to give the card to Boulware. (Tr. Trans. 54:7-14). Boulware refused, and instead told Kienel that they were going to purchase boots. (Tr. Trans. 54:22-25). They entered a V.I.M. store and Boulware picked a pair of boots that he wanted, but Kienel told Boulware that they were too expensive. (Tr. Trans. 55:1-6). Boulware selected another pair of shoes, which Kienel agreed to purchase. (Tr. Trans. 55:9-25).

After purchasing the shoes, Kienel parted ways with the other two and eventually made his way home. (Tr. Trans. 56:4-13). Once home, Kienel called the police to report the incident.

5

(Tr. Trans. 57:10-12). About ten or twenty minutes later, four or five officers came to Kienel's apartment and took him to Broadway Avenue between 147th and 148th Street, where Boulware was being arrested by police officers. There, Kienel identified Boulware as the man who had robbed him. (Tr. Trans. 57:16-59:17).

At the time of the incident, Kienel was not a Crip. (Tr. Trans. 75:8-9). Further, Kienel had never seen or spoken with Boulware prior to the incident, nor had he ever used drugs with Boulware or asked Boulware to provide him with drugs. (Tr. Trans. 75:17-25).

### 3. Boulware's Defense

At the time of trial, Boulware was forty years old and had been using cocaine and crack-cocaine for at least twenty years. (Tr. Trans. 122:18-123:7). Furthermore, Boulware found out at age twenty that he was HIV positive, and subsequently took a razor and cut up his back "so [he] would never take [his] shirt off to nobody's daughter and infect them the way [he] was infected." (Tr. Trans. 123:21-124:2). These razor cuts left his back full of scars. (Id.).

Boulware used to support his drug habit by buying drugs for others and charging a fee, or selling fake drugs. (Tr. Trans. 148:15-150:3, 155:19-156:6). Boulware would also make money from people looking for prostitutes. As he described, "[I]f somebody come and they're looking for a girl . . . if it's a female available that I know if she's available I'll get one if not I just take the money and make them believe that they're going to get a girl and just beat them, run away, step with the money." (Tr. Trans. 124:25-125:5, 155:19-25). As Boulware further described his life, "If you not trying to solicit no prostitution or buy no illegal drugs you will never run into me . . . ." (Tr. Trans. 155:16-18).

Boulware has a number of prior convictions. In 2007, he was convicted for attempted tampering with physical evidence, petit larceny, and two counts of criminal possession of a

6

controlled substance in the seventh degree. (Tr. Trans 168:18-172:23). In 2006, he was convicted of fraudulent accosting, and two counts of criminal possession of a controlled substance in the seventh degree. (Tr. Trans. 172:24-175:8). In 2005, he was convicted of selling imitation crack and criminal possession of a controlled substance in the seventh degree. (Tr. Trans. 175:9-25). In 2003, he was convicted of violating the public health laws and for criminal sale of a controlled substance in the fifth degree. (Tr. Trans. 176:8-177:15). In 2000, he was convicted of petit larceny and of violating the public health laws. (Tr. Trans. 177:16-178:12).

Prior to August 28, 2007, Boulware had known Kinder, whom he referred to as "Joey," for several months. (Tr. Trans. 126:5-17, 145:7-22). Boulware bought cocaine numerous times for Kinder at 546 West 148th Street (the "Building"), a "coke spot" where Boulware would go to get high. (Tr. Trans. 125:10-24, 126:16-23). There were also women in the Building who supported their drug habits through prostitution. (Tr. Trans. 125:25-126:4). In addition to purchasing drugs for Kinder, Boulware also set Kinder up with a prostitute named Jessica. (Tr. Trans. 126:23-25).

Prior to August 29, 2007, Kienel, whom Boulware referred to as "Mighty Whitey," used to frequent the Building and Boulware had purchased marijuana and cocaine for him. (Tr. Trans. 127:12-24). Additionally, Kienel and Kinder lived on the same block, and Boulware witnessed the two together in the Building at least three different times. (Tr. Trans. 128:9-14).

### i. The Kinder Incident

On August 28, 2007, Boulware purchased a couple of "twenties" of cocaine for Kinder, and Kinder asked Boulware to set him up with a prostitute named Jessica. (Tr. Trans. 128:15-129:8). In return, Kinder told Boulware that he would "take care of [Boulware]," by giving him money or drugs. (Tr. Trans. 129:12-17). After Kinder finished "dealing" with Jessica, he

7

walked with Boulware out of the Building and told Boulware that he would "take care of [him] later" because he did not have enough money at that time to pay him. (Tr. Trans. 129:18-130:6).

Kinder proceeded to a nearby Chinese restaurant to purchase some food, and returned to the corner where Boulware was standing. (Tr. Trans. 130:9-14). Although he had no intention to purchase drugs, Boulware told Kinder that he needed ten dollars to get a "twenty" in an attempt to get some of the money he was owed from setting up Kinder with a prostitute. (Tr. Trans. 130:14-131:18). Kinder gave Boulware ten dollars, to which Boulware responded, "I thought you ain't had no money, you ain't getting nothing." (Tr. Trans. 130:24-25). Boulware then walked away with Kinder's money. (Tr. Trans. 130:24).

### ii.   The Kienel Incident

On August 29, 2007, Kienel and Boulware were planning on purchasing drugs together. (Tr. Trans. 133:11-13). Kienel said he would go out and get some money, so he and Boulware, along with Jamie Conklin ("Conklin"), visited four separate ATMs, none of which allowed Kienel to withdraw money. (Tr. Trans. 132:23-133:17). Subsequently, the three of them went to a V.I.M. store to purchase boots that could be exchanged for drugs. (Tr. Trans. 134:4-136:17). While Kienel and Boulware were picking out the boots, Conklin went across the street to a Western Union to get some money. (Tr. Trans. 136:20-24).

After Kienel purchased the boots, Boulware told Kienel to meet him in front of the liquor store while he and Conklin took the boots to exchange them for drugs. (Tr. Trans. 137-38). In exchange for the boots, Boulware was able to get "five cracks." (Tr. Trans. 139:1-6). Boulware took the drugs back to the Building, "got high," and did not go back to meet Kienel because he "wasn't in no real rush to get back around the corner to him." (Tr. Trans. 139:10-17). Boulware did not see Kienel again until he was arrested later that day. (Tr. Trans. 139:19-140:6).

## B. Procedural History

### 1. Verdict, Sentencing and Appeal

On May 19, 2008, at the end of the trial, the jury found Boulware guilty on both counts of robbery in the first degree, N.Y. Penal Law § 160.15(4). (Tr. Trans. 252:19-253:1). At Boulware's sentencing hearing, on July 2, 2008, Justice Robert M. Stolz sentenced Boulware, as a second felony offender, to eight years imprisonment on each count of first degree robbery—the sentences to run consecutively—and five years of post-release supervision. (Sentencing Transcript ("Sent. Trans.") 16:16-24). Justice Stolz also noted that the evidence presented at trial was sufficient to sustain the two charges of robbery in the first degree. (Sent. Trans. 16:12-15).

After filing a timely notice of appeal, Boulware obtained leave to file an appeal on September 16, 2008, and he filed his appellate brief on June 10, 2009. (Government's Opposition to Boulware's Petition dated April 4, 2011 ("Opp'n") Exhibit A ("Opp'n Ex. A")). In his brief, Boulware contended that his verdict was "against the weight of the evidence" and that his eight-year sentence for each of the two counts of first degree robbery should run concurrently. (Id. at 27-32). On December 3, 2009, the New York Supreme Court, Appellate Division, First Department (the "Appellate Division") unanimously affirmed Justice Stolz's sentence, holding that the evidence was sufficient to sustain the verdict and that there was no basis for reducing the sentence. People v. Boulware, 888 N.Y.S.2d 882, 882-83 (1st Dep't 2009).

On January 5, 2010, Boulware's counsel requested leave to file an appeal with the New York Court of Appeals. (Opp'n Ex. D). On May 11, 2010, the New York Court of Appeals denied the request, noting that "there is no question of law presented which ought to be reviewed by the Court of Appeals." (Opp'n Ex. E); People v. Boulware, 903 N.Y.S.2d 774 (2010).

## 2. The Instant Petition

On November 19, 2010, Boulware, proceeding pro se, timely filed the instant Petition. (Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition") (Dkt. No. 1)).[1] Boulware contends that (1) he was denied due process of law because his verdict was not based on sufficient evidence, and (2) his sentence should be modified "in [the court's] discretion and the interest of justice." (Pet. at 7).[2]

The Government filed its opposition to the Petition on April 4, 2011, contending that (1) the evidence was legally sufficient to support Boulware's verdict, and (2) Boulware's challenge to the length of his sentence is procedurally barred and is also not a cognizable claim on habeas review. (Opp'n at 15-22).

The Court issued an Order dated May 10, 2011, noting that Boulware had not responded to the Government's opposition to his Petition, and giving him until May 31, 2011 to file any papers. While Boulware did not file any formal papers, he sent the undersigned a letter dated

---

[1] As a pro se litigant, Boulware benefits from the "prison mailbox rule," which provides that a petition for a writ of habeas corpus is deemed filed on the day it is handed to prison officials for mailing. See Houston v. Lack, 487 U.S. 266, 276 (1988). Because Boulware delivered his petition to prison authorities for mailing on November 19, 2010, I will consider it filed on that date, well within the applicable one year statute of limitations. 28 U.S.C. § 2244(d)(1); (Pet. at 11).

[2] Boulware's Petition appears to consist of four different documents, each of which contains information regarding Boulware's claims. In light of this assembly of documents, Boulware's motion papers have inconsistent page numbers, and at times, no page number at all. For clarity, when referring to a specific page of the motion, my page reference will correspond to the order in which the pages were filed, and not necessarily to the number that appears on that page. For example, even though the seventh page of the moving papers does not have a page number, I will cite to it as page 7.

April 7, 2011, noting that he had received the opposition papers and setting forth arguments in response.[3]

## II. DISCUSSION

### A. Exhaustion

Before a federal court can consider a petition for habeas relief, a petitioner must exhaust all state-provided remedies. See 28 U.S.C. § 2254(b)(1); O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999). The doctrine of exhaustion "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to federal courts . . ." O'Sullivan, 526 U.S. at 845. Such a full and fair opportunity requires the petitioner to "'fairly present' the federal claim 'in each appropriate state court.'" Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010) (citing Baldwin v. Reese, 541 U.S. 27, 29 (2004)); see also O'Sullivan, 526 U.S. at 845 ("[S]tate prisoners must give state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). This includes fair presentment to the state's highest court. See Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (citing Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997)) ("The petitioner must apprise the highest state court of both the factual and the legal premises of the federal claims ultimately asserted in the habeas petition."). A petitioner need not have cited "book and verse of the federal Constitution" in state court to exhaust his claim. Picard v. O'Connor, 404 U.S. 270, 275 (1971). Instead, he may fairly present his claim in state court through:

> (a) [R]eliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c)

---

[3] I will direct the Clerk to docket this letter and make it part of the Court record.

11

> assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye v. Attorney Gen. of State of N.Y., 696 F.2d 186, 194 (2d Cir. 1982).

However, a claim is not fairly presented where the state court must read "beyond a petition or brief" in order to find material that alerts the court to the existence of a petitioner's federal claim. Baldwin, 541 U.S. at 32.

With respect to his sufficiency of the evidence claim, Boulware raised the claim in federal constitutional terms on appeal to the Appellate Division, and subsequently sought leave to appeal to the New York Court of Appeals on the same ground. Therefore, Boulware has exhausted that claim.[4]

However, Boulware has failed to exhaust his claim for a modification of his sentence. Although he did raise the issue on appeal to the Appellate Division and the Court of Appeals, he requested review and modification of his sentence in the court's "discretion and in the interest of justice," not on any federal constitutional ground. (Opp'n Ex. A, at 32-35). And, in his brief to the Appellate Division—which he also attached to his application for leave to appeal to the Court of Appeals—Boulware cites only one case, People v. Rosenthal, 760 N.Y.S.2d 460 (1st Dep't 2003), for the proposition that the Appellate Division has plenary powers to modify an unduly harsh sentence. Rosenthal contains no federal constitutional discussion at all. Under such circumstances, Boulware has not fairly presented his claim in federal constitutional terms and it is therefore unexhausted. See, e.g., Richardson, 621 F.3d at 201 (citing Baldwin, 541 U.S. at 32) (federal claim not presented if claim not mentioned in petitioner's brief); Smith v. Duncan, 411

---

[4] The Government concedes that Boulware has exhausted this claim. (Opp'n at 14).

F.3d 340, 346-47 (2d Cir. 2005) (federal claim not exhausted where petitioner argued claim in state law terms rather than federal constitutional terms).

However, unexhausted claims are deemed exhausted and procedurally defaulted if the petitioner no longer has any remedy available in state court. See Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) (quoting Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001)). The Government correctly notes that such is the circumstance here. (Opp'n at 15). Boulware cannot return to the New York Court of Appeals to present a federal constitutional claim because he already made the one request for leave to appeal to which he is entitled. See, e.g., Richardson, 621 F.3d at 201 (citing Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000)) ("Were we to dismiss [the petition] without prejudice to allow [petitioner] to exhaust his claim in state court, New York procedural rules would bar him from raising the claim at this point."). Accordingly, because Boulware has no further remedies available to him in state court, he has procedurally defaulted on his modification claim.

A petitioner who has "procedurally defaulted on his claims . . . is ineligible for federal habeas relief absent a showing of 'cause and prejudice' or 'a fundamental miscarriage of justice.'" Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006) (citing O'Sullivan, 526 U.S. at 854). Demonstrating cause "requires a showing of some external impediment preventing counsel from constructing or raising the claim." Murray v. Carrier, 477 U.S. 478, 492 (1986). A petitioner suffers actual prejudice when the outcome of the case would have likely been different but for the alleged constitutional violation. See Reed v. Ross, 468 U.S. 1, 12 (1984). Even absent a showing of cause and prejudice, a petitioner's procedurally defaulted claim may merit habeas review if he can show that denying review would result in a "fundamental miscarriage of

justice," where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 474 U.S. at 495-96.

Boulware cannot overcome the procedural bar because he has not established cause for his default. Boulware offers no reason why his claim was not properly raised in state court. Because Boulware has not demonstrated cause for his default, I need not address the issue of prejudice. See McCleskey v. Zant, 499 U.S. 467, 502 (1991). Finally, Boulware offers no new evidence that he is actually innocent and that failure to consider his claim would result in a fundamental miscarriage of justice. Therefore, Boulware's claim for a modification of his sentence does not merit habeas review by this Court.[5]

## B. AEDPA Standard of Review

Where a state court has addressed a petitioner's claim on the merits, under the Antiterrorism and Effective Death Penalty Act ("AEDPA") a federal court may provide habeas relief only where the petitioner demonstrates that the state court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); see also Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

A state court decision is "contrary to" clearly established Federal law "if the state court 'applied a rule that contradicts' that precedent, or reached a different result than the Supreme

---

[5] Even if the Court were to conclude that this claim was not procedurally barred, it is not cognizable on habeas review. The Second Circuit has held that where, as here, a sentence is within the range prescribed by state law, no federal constitutional issue is presented. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); see also Black v. Conway, No. 11 Civ. 480 (GBD) (AJP), 2011 WL 2610530, at *12 n.23 (S.D.N.Y. June 30, 2011) (citing cases).

14

Court on facts that are 'materially indistinguishable.'" Mannix v. Phillips, 619 F.3d 187, 195 (2d Cir. 2010) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)) (internal alterations omitted). As long as the state court decision applies the correct legal rule to the facts of a petitioner's case, it is not subject to habeas review, even if the federal court would have reached a different conclusion if it were to apply the rule itself. Williams, 529 U.S. at 406.

A state court decision involves an "unreasonable application" of clearly established federal law if the court correctly identifies the legal rule set forth in governing Supreme Court cases, but unreasonably applies the rule to the facts of the case. Id. at 407. A federal court may grant habeas relief only where the state court decision as it pertains to any issue of federal law was "objectively unreasonable" in light of relevant precedent; thus, in construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Williams, 529 U.S. at 411; see also Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010) ("The proper inquiry is not whether a state court's application of, or refusal to extend, the governing law was erroneous, but whether it was 'objectively unreasonable.'" (quoting Williams, 529 U.S. at 409-10)). For the purpose of federal habeas review, the factual determinations made by a state court are presumed correct, and a petitioner bears the burden of rebutting this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Finally, Boulware is proceeding pro se, and therefore his submissions should be held to "less stringent standards than formal pleadings drafted by lawyers." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)); see also Seidemann v. Bowen, 584 F.3d 104, 118 (2d Cir. 2009). In addition, the court must liberally construe the pleadings and interpret them "to raise the strongest arguments that they suggest." Diaz v. United States, 517 F.3d 608, 613 (2d Cir. 2008) (quoting Burgos v.

15

Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Pro se status, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (internal quotations omitted).

### C. Sufficiency of the Evidence

Boulware argues, in essence, that his conviction was not supported by sufficient evidence—"the testimony of two incredible witnesses whose accounts were riddled with contradictions and inconsistencies." (Pet. at 7).[6]

On habeas review, a sufficiency of the evidence claim turns on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)). "In determining the sufficiency of the evidence, [the court] must . . . decide whether the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (quoting Mapp v. Warden, N.Y. State Corr. Inst. for Women, 531 F.2d 1167, 1173 n.8 (2d Cir. 1976)). Moreover, when examining a record that supports conflicting inferences, the Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Indeed, assessments of "the credibility of witnesses are for the jury . . . ; we defer to the jury's assessment of both of these issues." Maldonado v. Scully, 86 F.3d 32, 35

---

[6] To the extent that Boulware contends his conviction was against the weight of evidence, such a claim is a pure state law claim not cognizable on habeas review. See, e.g., McKinnon v. Superintendent, Great Meadow Corr. Facility, No. 08-2828-pr, 2011 WL 2005112, at *4 (2d Cir. May 24, 2011).

16

(2d Cir. 1996) (citations omitted); see also Bossett, 41 F.3d at 830 ("[T]he jury is exclusively responsible for determining a witness' credibility.").

Furthermore, "[w]hen evaluating the sufficiency of the evidence adduced at a state court criminal proceeding, we 'look to state law to determine elements' of the relevant crime." Henry v. Ricks, 578 F.3d 134, 137-38 (2d Cir. 2009) (quoting Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000)). Under New York State law, the elements of first degree robbery are: "(1) the forcible stealing of property, and that (2) in the course of the commission of the crime or immediate flight therefrom, the defendant displayed what appeared to be a firearm . . . ." Aparicio, 269 F.3d at 97 (citing N.Y. Penal Law § 160.15(4)).

After reviewing the record in the light most favorable to the prosecution, I find that a rational trier of fact could have found the essential elements of Boulware's first degree robbery charge beyond a reasonable doubt. Both Kinder and Kienel's testimony, if viewed in the light most favorable to the prosecution, established the requisite elements. With respect to Kinder, the record demonstrates that when Kinder did not submit to Boulware's demand for money, Boulware became upset, pulled back his shirt, and patted a bulge on his right side, stating, "[S]ee this, this is for protection. I don't want to have to use this against you." (Tr. Trans. 25:9-13). Indeed, Kinder believed that the bulge was a gun or a knife. (Tr. Trans. 25:15-19). A rational trier of fact could find that these circumstances constituted the forcible stealing of property, during the commission of which Boulware displayed a firearm. See, e.g., People v. Lopez, 538 N.Y.S.2d 788, 742 (1989) (evidence of first degree robbery sufficient where, although victim never saw a gun, defendant confronted victim, announced a stickup, placed hand in vest jacket, and demanded victim's radio); People v. Lewis, 758 N.Y.S.2d 1, 2 (1st Dep't 2003) (evidence of first degree robbery sufficient where defendant grabbed at a bulge in his waistband and told

17

victim, "If you're not going not going to give me the money, then I'll have to do something about it"); People v. Haney, 556 N.Y.S.2d 939, 940 (2d Dep't 1990) (evidence of first degree robbery sufficient where, defendant's gesture with hand inside pocket, coupled with defendant's statements during the course of a robbery, led victim to believe defendant had a gun).

Kienel testified that Boulware tried to take Kienel's wallet out of his hands. (Tr. Trans. 45:14-20). After failing to get the wallet, Boulware lifted up his shirt, displayed something black in his pocket that Kienel believed to be the end of a gun, and asked Kienel, "How much is your life worth?" (Tr. Trans. 45:25-47:23). Boulware subsequently took Kienel to four different ATMs in an attempt to withdraw money on Kienel's card, and eventually took Kienel to V.I.M. to purchase boots using Kienel's card. (Tr. Trans. 48:20-56:5). Again, a rational trier of fact could find that Boulware forcibly stole property from Kienel, during the commission of which he displayed a weapon. See, e.g., Lopez, 538 N.Y.S.2d at 792; People v. Rogers, 796 N.Y.S.2d 134, 134 (2d Dep't 2005) (evidence of first degree robbery sufficient where victim observed a "long protruding object" from defendant's jacket which victim thought was "most likely a gun"); People v. Robinson, 567 N.Y.S.2d 115, 115-16 (2d Dep't 1991) (evidence of first degree robbery sufficient where defendant displayed object which could reasonably be perceived as a handgun and threatened victim).

To be sure, Boulware's testimony is entirely inconsistent with that of both Kinder and Kienel. However, the jury could have discounted the credibility of Boulware's testimony for any number of reasons, including his criminal history or his testimony that he has spent much of his life lying to make money. It is squarely within the province of the jury to make these credibility determinations and weigh the evidence that is presented to them, and a court should defer to those determinations. Maldonado, 86 F.3d at 35. "In short, here, as in prior cases, 'the jury's

18

decision was largely a matter of choosing whether to believe [the defense's] version of the events or to believe the version offered by the state. The jury chose to believe the state's witnesses . . . . We cannot say that no rational [factfinder] could have found guilt beyond a reasonable doubt on all the evidence.'" Black, 2011 WL 2610530, at *10 (quoting Jamison v. Grier, No. 01 Civ. 6678 (AGS) (AJP), 2002 WL 100642, at *12 (S.D.N.Y. Jan. 25, 2002)). Consequently, Boulware's sufficiency of the evidence claim should be denied.

## III. CONCLUSION

For the foregoing reasons, I recommend that Boulware's Petition (Dkt. No. 1) be DENIED. Further, I recommend that the Court decline to issue a certification of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A) because Boulware has failed to make a "substantial showing of the denial of a constitutional right." Id. § 2253(c)(2).

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Batts. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010) (citing Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) and Mario v. P & C Food

19

Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. If Boulware does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from the Government. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Dated: New York, New York
July 19, 2011

/s/ James L. Cott
JAMES L. COTT
United States Magistrate Judge

**Copies of this Report and Recommendation have been mailed to:**

Derek Boulware
DIN 08A4612
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

Alyson J. Gill
Assistant Attorney General
120 Broadway
New York, NY 10271